Opinion for the court filed by Circuit Judge BRYSON. Dissenting opinion filed by Circuit Judge DYK.
BRYSON, Circuit Judge.
In this patent infringement action, plaintiffs American Medical Systems, Inc., and Laserscope appeal an order granting summary judgment of noninfringement to defendant Biolitec, Inc. The patent in suit, Laserscope’s U.S. Patent No. 6,986,764 (“the '764 patent”), is entitled “Method and System for Photoselective Vaporization of the Prostate, and Other Tissue.” It claims various methods and devices for vaporizing tissue by using laser radiation. The district court based its summary judgment order on its conclusion that Biolitec’s accused device does not perform “photoselective vaporization of tissue,” a term that is contained only in the preambles of the asserted claims. Because we conclude that the disputed preamble term does not limit the asserted claims, we reverse and remand.
*1356 I
The invention of the '764 patent can be used to treat Benign Prostatic Hyperplasia (“BPH”), a condition in which growth of the prostate gland restricts the passage of urine out of the bladder and through the urethra. Vaporization, or ablation, of some of the prostate tissue reduces the size of the prostate and can relieve bladder outlet obstructions. As described in the patent, this type of BPH treatment generally involves the insertion of a cytoscope into the urethra, the provision of an irrigant such as sterile water, and the application of high-intensity laser radiation to the target tissue by means of an optical fiber.
According to the specification of the '764 patent, prior art tissue vaporization systems were inefficient when used with continuous irrigation, and they frequently caused side effects including residual tissue coagulation, i.e., the generation of a layer of thermally denatured tissue, which led to swelling, transient urinary retention, and infection. '764 patent, col. 2,11. 33-41. The ineffectiveness of the prior art systems was due in part to their use of longer wavelengths of laser radiation, such as 2100 or 1064 nanometers (“nm”). At 2100 nm, the specification explains, laser radiation is “strongly absorbed by water in the prostate tissue” and there is “essentially no selective absorption by blood.” When combined with the pulse energies and pulse durations used in the prior art devices, the use of radiation of that wavelength led to violent tissue disruption and “poor hemostasis” (stoppage of bleeding). Id., col. 2, 11. 17-20, 28-32. At 1064 nm, the radiation is hemostatic when used at high power levels, but has low absorption in blood and prostate tissue that “leads to inefficient ablation and a large residual layer of thermally denatured tissue several millimeters thick.” Id., col. 2, 11. 36-38. By contrast, the specification explains, laser radiation at a wavelength of 532 nm “is selectively absorbed by blood, leading to good hemostasis,” and when sufficient power is used at that wavelength, the process leaves behind a layer of denatured tissue less than 1 millimeter thick, which reduces swelling and painful urination. Id., col. 2, 11. 49-56. The specification adds, however, that even when using a wavelength of 532 nm, prior art techniques were inefficient and caused significant residual coagulation. Id., col. 2, 11. 59-65.
The inventors of the '764 patent determined that the use of high “volumetric power density,” i.e., a high amount of energy delivered to a given volume of tissue, would result in increased vaporization efficiency while minimizing residual coagulation. The patent is directed to various methods and devices for achieving high volumetric power density for tissue vaporization, by manipulating variables such as wavelength, output power, beam quality, irrigant composition, and distance between the optical fiber and the tissue. Those variables in turn affect the resulting irradiance level, spot-size, and absorption depth.
Claim 31 is representative of the method claims. It recites:
A method for photoselective vaporization of tissue, comprising:
delivering laser radiation to a treatment area on the tissue, the laser radiation having a wave-length and having irradiance in the treatment area sufficient to cause vaporization of a substantially greater volume of tissue than a volume of residual coagulated tissue caused by the laser radiation, wherein the delivered laser radiation has an average irradiance in the treatment area greater than 10 kiloWatts/cm2 in a spot size at least 0.05 mm2.
The apparatus claims are generally similar, except that they also recite a laser and an endoscope having an optical fiber for delivering the laser radiation.
*1357 Most of the independent claims do not specify a maximum or minimum wavelength for the laser radiation used in the claimed methods or by the claimed apparatus, although several of them have dependent claims specifying that “the laser radiation has a wavelength in a range from about 650 to about 200 nm.” The other independent claims expressly recite “laser radiation having a wavelength in a range of about 200 nm to about 650 nm.” With the exception of claims 1 and 16, all of the independent claims contain limitations requiring that the laser radiation have a “wavelength and irradianee in the treatment area sufficient to cause vaporization of a substantially greater volume of tissue than a volume of residual coagulated tissue caused by the laser radiation.” Claim 1 requires that the laser radiation be “absorbed substantially completely by the tissue within about 1 mm of the surface,” and that it have “average irradianee in the treatment area greater than 10 kiloWatts/cm2 in a spot size at least about 0.05 mm2.” Claim 16 requires the delivery of laser radiation and a flow of transparent liquid irrigant, with the laser “causing vaporization of a volume of tissue greater than a volume of residual coagulation of tissue, and having irradianee in the treatment area greater than 10 kiloWatts/cm2 in a spot size at least about 0.05 mm2.”
The plaintiffs filed suit against Biolitec in the United States District Court for the District of Massachusetts, alleging that Biolitee’s Evolve" laser system and method of use infringed a number of the claims of the '764 patent. The accused product is a laser-powered tissue ablation system that uses radiation having a wavelength of 980 nm. It includes an optical fiber probe for administering the radiation by direct contact with the target tissue.
Following a Markman hearing, the district court issued an order construing several key terms in the asserted claims. Am. Med. Sys., Inc. v. Biolitec, Inc., 569 F.Supp.2d 313 (D.Mass.2008). Most sharply disputed were the terms in the preambles of the asserted claims: “A method for photoselective vaporization of tissue” and “An apparatus for photoselective vaporization of tissue.” The plaintiffs argued that the preamble language (particularly the phrase “photoselective vaporization”) simply describes the invention as a whole and should not be construed as a limitation of any of the asserted claims. The district court, however, ruled that the repeated use of the phrase “photoselective vaporization” in the specification and claims indicated that “photoselective vaporization” is a “fundamental characteristic” of the invention, albeit not its central innovative feature. Id. at 320-22. The court found support for that conclusion in the patent’s discussion of the prior art. In particular, the court relied on the patent’s criticism of earlier laser systems that used longer wavelengths of 2100 nm or 1064 nm. Those systems, according to the specification, produced “low” or “no” selective absorption of the radiation by blood and tissue; by contrast to those systems, the specification praised a prior art system that used a shorter wavelength of 532 nm that was “selectively absorbed by blood.” Id. at 321. Accordingly, the court construed the term “photoselective vaporization” to mean “using a wavelength that is highly absorptive in the tissue, while being absorbed only to a negligible degree by water or other irrigant.” Id. at 327.
In light of the district court’s claim construction ruling, Biolitec moved for summary judgment of noninfringement, asserting that its Evolve™ laser system operated at a wavelength (980 nm) at which the energy is absorbed to more than “a negligible degree by water or other irrigant.” The district court granted Biolitec’s motion. Am. Med. Sys., Inc. v. Biolitec, Inc., 603 F.Supp.2d 251 (D.Mass.2009). The *1358 court began by noting certain undisputed facts concerning the properties of 980 nm laser light (as in the accused product), as compared with 532 nm laser light (the wavelength of the '764 patent’s preferred and commercial embodiment). For example, the absorption coefficient of 980 nm laser energy in water is 0.43, whereas the absorption coefficient of 532 nm laser energy in water is only 0.00036; and 4.2% of 980 nm laser energy is absorbed by water at a distance of 1 mm from prostate tissue, whereas only 0.004% of 532 nm laser energy is absorbed by water at that distance. Id. at 255-56. The district court also observed that Biolitec’s accused device operates by placing the device in direct contact with the target tissue so as to prevent absorption of the energy by the water irrigant. In light of those facts, the court concluded that “[w]hen compared to 532 nm laser light, 980 nm laser light is more than negligibly absorbed by the water irrigant” and thus did not satisfy the “photo-selective vaporization” limitation of the '764 patent, as the district court construed it. Id. at 256. The court therefore held that Biolitec’s accused device did not literally infringe the '764 patent.
The district court also addressed the issue of infringement under the doctrine of equivalents. The court concluded that the “function-way-result” test was ill-suited to evaluating the patent in suit, but it held that under the “all limitations” rule and the corollary “specific exclusion” principle developed by this court, Biolitec’s device did not infringe the '764 patent by equivalents. Am. Med. Sys., 603 F.Supp.2d at 257-58.
On appeal, the plaintiffs contend that (1) the term “photoselective vaporization” in the preamble of each of the asserted claims should not be construed as a claim limitation; (2) if “photoselective vaporization” is a limitation on the claims, the district court erred in construing that term to require a wavelength that is “absorbed only to a negligible degree by water or other irrigant”; and (3) if the district court’s claim construction is correct, the district court erred in its infringement analysis in several respects. We conclude that the preamble phrase “photoselective vaporization of tissue,” and particularly the descriptor “photoselective,” does not limit the claims of the '764 patent. Therefore, we need not address the plaintiffs’ remaining arguments. Because the district court’s grant of summary judgment was predicated entirely on its conclusion that Biolitec’s accused device “does not violate the ‘photoselective vaporization’ claim limitation in the '764 patent as construed in the Markman Order,” Am. Med. Sys., 603 F.Supp.2d at 256, we reverse and remand for further proceedings.
II
Whether to treat a preamble term as a claim limitation is “determined on the facts of each case in light of the claim as a whole and the invention described in the patent.” Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 831 (Fed.Cir.2003). While there is no simple test for determining when a preamble limits claim scope, we have set forth some general principles to guide that inquiry. “Generally,” we have said, “the preamble does not limit the claims.” Allen Eng’g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1346 (Fed.Cir.2002). Nonetheless, the preamble may be construed as limiting “if it recites essential structure or steps, or if it is ‘necessary to give life, meaning, and vitality’ to the claim.” Catalina Mktg. Int’l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed.Cir.2002), quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed.Cir.1999). A preamble is not regarded as limiting, however, “when the claim body describes a structurally complete invention such that *1359 deletion of the preamble phrase does not affect the structure or steps of the claimed invention.” Catalina, 289 F.3d at 809. If the preamble “is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a [prior art] rejection), we do not construe it to be a separate limitation.” Symantec Corp. v. Computer Assocs. Int’l, Inc., 522 F.3d 1279, 1288-89 (Fed.Cir.2008). We have held that the preamble has no separate limiting effect if, for example, “the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention.” IMS Tech, Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1434-35 (Fed.Cir.2000).
In light of those principles, we conclude that the preamble language in the asserted claims of the '764 patent does not constitute a limitation of the claims. More specifically, we reject the district court’s suggestion, implicit in its claim construction and infringement analyses, that the preamble descriptor “photoselective” limits the claims to a particular (albeit unspecified) range of wavelengths at which laser radiation is “absorbed only to a negligible degree by water or other irrigant.”
First, there is no suggestion in the prosecution history of the '764 patent that the inventors added the phrase “photoselective vaporization” in order to distinguish their invention from the prior art. Rather, the examiner’s primary reason for approval was the claims’ use of high power densities to vaporize tissue without causing significant residual tissue damage.
Second, contrary to Biolitec’s argument, the preamble term “photoselective vaporization of tissue” does not provide a necessary antecedent basis for the term “the tissue” in the bodies of each of the independent claims. The preamble’s reference to “vaporization of tissue” does not specify a particular type or location of tissue being treated. Nor does the generic term “tissue” in the preamble provide any “context essential to understandfing]” the meaning of “the tissue” in the body of each claim. Seachange Int’l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1376 (Fed.Cir.2005). Thus, the claim drafters did not rely on the preamble language to define or refine the scope of the asserted claims. See Catalina, 289 F.3d at 808 (“[Dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention.”).
Third, and most importantly, the descriptor “photoselective” does not embody an essential component of the invention. Instead, the term “photoselective vaporization” is simply a descriptive name for the invention that is fully set forth in the bodies of the claims. See Storage Tech, 329 F.3d at 831 (preamble term “policy caching method” did not limit claims because it served only as a “convenient label for the invention as a whole”). The bodies of the asserted apparatus claims (claims 63-64) describe a structurally complete device, including a laser adapted to deliver “radiation at a wavelength and irradiance ... sufficient to cause [tissue] vaporization[.]” The bodies of those claims identify the covered wavelengths by function (“sufficient to cause vaporization”), and nothing in the claim language suggests that the term “photoselective” further limits those wavelengths. The inference that the asserted apparatus claims do not require the use of energy of a particular wavelength is considerably strengthened by the fact that a number of other apparatus claims (claims 59-62 and 67-74), which contain the same disputed preamble language, limit the wavelength of the radiation to the range from “about 200 nm to about 650 nm.” If the term “photoselec *1360 tive” were deemed independently limiting, it would either be redundant or in conflict with the specific wavelength range set forth in the body of those claims.
The apparatus claims make clear that one can practice the invention without using wavelengths in the 200 to 650 nm range described by the '764 specification as having “strong oxyhemoglobin absorption” and “relatively weak water absorption,” as long as the energy applied is sufficient to “cause vaporization of a substantially greater volume of tissue than a volume of residual coagulated tissue.” That point is underscored by the fact that the apparatus claims reciting the 200 to 650 nm range also require a lower minimum irradiance, which indicates that the purpose of the claims is to maximize volumetric power density through different combinations of variables; the '764 patent thus contemplates that with an increase in the laser’s wavelength, more power will be necessary to vaporize the tissue and minimize coagulation.
Likewise, the bodies of the asserted method claims contain all the steps necessary to practice the invention. Independent claims 16, 31, 36, 40, and 42 require the delivery of radiation “causing” or “sufficient to cause” vaporization “of a substantially greater volume of tissue than a volume of residual coagulated tissue.” Independent claim 1 does not explicitly require vaporization, but it requires that the laser radiation be “absorbed substantially completely by the tissue within 1 mm of the surface.” Thus, in each of the asserted method claims, as in the apparatus claims, the invention is recited in functional terms; as long as the stated objective is achieved, through the various recited combinations of wavelength, irradiance, output power, spot size, irrigant type, and distance between the optical fiber and the tissue, it is irrelevant whether a particular wavelength is used that would satisfy an independent requirement of being “photo-selective.” While, as a practical matter, use of a wavelength of laser radiation that is selectively absorbed by tissue to at least some degree will likely be necessary to satisfy the functional requirements, the claim language does not require any particular wavelength range (or upper limit).
As in the case of the apparatus claims, other claims among the method claims provide strong support for the plaintiffs’ argument that the asserted method claims are not limited to wavelengths having a prescribed degree of differential absorption in tissue and water. Method claims 1, 16, and 31 each have dependent claims that recite the use of wavelengths “from about 200 nm to about 650 nm.” Under the doctrine of claim differentiation, those dependent claims give rise to a presumption that the broader independent claims are not confined to that range. Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed.Cir.2005) (en banc). Thus, in every asserted claim of the '764 patent, the language in the body of the claims recites a complete invention for achieving the stated purpose of applying laser radiation in a high volumetric power density. Removal of the duplicative preamble language would neither alter the scope of the claims nor introduce ambiguity as to their coverage.
The specification of the '764 patent further confirms that “photoselective vaporization” is a label for the overall invention and not a limitation on the claims. Although the phrase “photoselective vaporization” appears in the title, in the abstract, and six times in the rest of the written description, it is consistently used in reference to the entire invention’s emphasis on improved vaporization efficiency through high power densities. The broad recitation in the “Field of Invention,” which states that “[t]he present invention relates generally to laser treatment of soft tissue, *1361 and more particularly to photoselective vaporization of the prostate PYP, and to photoselective vaporization of other tissue,” supports the plaintiffs’ position that the phrase is meant to serve as a label for the invention as a whole. The other references to the term, including those in the abstract and in a key passage cited by the district court, also indicate that the phrase “photoselective vaporization” describes the overall invention.
The district court based its claim construction largely on the following sentence in the specification ('764 patent, col. 3, line 66, through col. 4, line 6):
Photoselective vaporization of tissue, such as the prostate for treatment of BPH, is based upon applying a high intensity radiation to prostate tissue using a radiation that is highly absorptive in the tissue, while being absorbed only to a negligible degree by water or other irrigant during the operation, at power densities such that the majority of the energy is converted to vaporization of the tissue without significant residual coagulation of adjacent tissue.
As the court acknowledged, 569 F.Supp.2d at 322, the use of the words “based upon,” rather than “means” or “is,” undermines the suggestion that the term “photoselective vaporization” is used as a definition or limitation of the claim terms. In any event, however, to the extent that the sentence describes “photoselective vaporization,” it is not limited to describing radiation with wavelengths that are absorbed to a substantially greater degree by tissue than by water, but also describes other key aspects of the overall invention. Those include the use of high irradiance levels to achieve high “power densities” and efficient vaporization of tissue, which the district court deemed the “central innovative feature” of the invention as a whole. Moreover, the sentence’s reference to absorption “during the operation” alludes to the principle, expressed elsewhere in the patent, that in practice the irradiance delivered to a treatment area can be increased and the absorption of the laser energy in the irrigant correspondingly decreased not only by selecting an appropriate wavelength for the laser output, but also by reducing the distance between the optical fiber and the tissue, thereby minimizing the amount of liquid through which the laser energy must pass. See '764 patent, col. 5, 11. 52-59. Thus, we conclude that the quoted sentence, read in context, does not use the term “photoselective vaporization” to confine the invention to the use of particular wavelengths but is better understood as a description of the overall process described and claimed in the '764 patent.
In support of its argument that the term “photoselective” is a limitation on the claims, Biolitec also points to a portion of the “Detailed Description” section of the specification, which states, “The wavelength used according to the present invention for BPH treatment should be strongly absorbed in the prostate tissue to help initiate and maintain tissue vaporization .... The wavelength also must be minimally absorbed by the irrigant ... used during the procedure, typically water.” '764 patent, col. 12, 11. 16-21. That language indicates that using radiation of certain wavelengths may increase the effectiveness of the invention, but it does not suggest that the invention is limited to particular wavelengths regardless of the values of the other variables in a particular device. Although the quoted passage expresses a preference for using wavelengths of 200 to 650 nm, other portions of the '764 specification discuss embodiments using radiation with wavelengths up to 1000 nm. '764 patent, col. 4,11. 28-29. Moreover, as noted, the presence of claims reciting wavelengths of 200 to 650 nm gives rise to the inference that the remaining claims, *1362 which do not contain that express wavelength limitation, read on processes and devices using wavelengths outside that range. In addition, the specification refers to wavelengths in the 200 to 1000 nm range (a range that includes Biolitec’s device, which uses radiation of 980 nm wavelength) as the “preferabl[e]” wavelengths for use in practicing the invention. '764 patent, col. 4,11. 28-29.
The dissent argues that, while 200 to 1000 nm wavelengths are described as preferred “for some embodiments,” the “photoselective vaporization embodiment” is a “separate embodiment” that “is consistently described as having a wavelength in the 200-650 range.” However, the '764 specification does not support that interpretation. In the sole instance in which an “embodiment” is specifically described as involving “photoseleetive vaporization,” the subsequent description expresses no preferred wavelength range. Instead, it provides the following general explanation: “According to this embodiment, the method includes delivering laser radiation to the treatment area ... wherein the laser radiation has a wavelength and irradiance in the treatment area on the surface of the tissue sufficient [to cause] vaporization of a substantially greater volume of tissue than a volume of residual coagulated tissue caused by the laser radiation.” '764 patent, col. 5, 11. 22-29. Here, as in the patent’s claims employing nearly identical language, “photoseleetive vaporization” (the descriptor for the invention as a whole) is expressed in functional terms; i.e., as long as the selected wavelength and irradiance together result in “vaporization of a substantially greater volume of tissue than a volume of residual coagulated tissue,” no particular wavelength range is required. The specification does not delineate a particular wavelength range until later, when it addresses a more specific embodiment: “In other embodiments, the delivered laser radiation has a wavelength in a range of about 200 nm to about 650 nm.” Id., col. 5, 11. 41-42. The passages cited by the dissent, most of which refer to the invention as a whole, do not support the existence of a separate “photoseleetive vaporization embodiment”; they merely suggest, but do not require, the use of certain wavelengths as a means of increasing the invention’s overall effectiveness in conjunction with other variables.[1] Accordingly, the specification as a whole indicates that while wavelength is one of the variables employed in the invention, the claims (other than those specifically limited to 200 to 650 nm) are not limited to particular wavelengths exhibiting particular levels of differential absorption in tissue and water.
To be sure, the specification points out the drawbacks of prior art lasers that use longer-wavelength radiation to perform tissue ablation, noting that 2100 nm radiation results in “essentially no selective absorption by blood” and that 1064 nm radiation has “low absorption in blood and prostate tissue,” leading to inefficient ablation. See '764 patent, col. 2, 11. 15-41. However, both of those examples lie above the 200 to 1000 nm range that the '764 specification refers to as “preferabl[e].” The discussion of the prior art therefore falls far short of “mak[ing] clear that the invention does not include a particular fea *1363 ture,” SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed.Cir.2001), and does not rise to the level of a disclaimer of wavelengths between 650 and 1000 nm.
Read as a whole, the '764 patent discloses methods and devices for increasing power density in the application of laser energy, which may be achieved in ways that do not require a specific wavelength range. Other variables (including, e.g., irradiance, spot size, distance between optical fiber and tissue, irrigant type, and output power) are incorporated in various combinations in the independent and dependent claims, which suggests that while selection of an appropriate wavelength is one means by which the objectives set forth in the asserted claims can be achieved, no particular wavelength range is required by the claims.
Ill
For the foregoing reasons, we conclude that the district court erred when it construed the phrase “photoselective vaporization” as a claim limitation, rather than merely a label for the invention as a whole. We therefore reverse the summary judgment of noninfringement and remand for further proceedings addressing whether Biolitec’s accused device meets the remaining claim limitations of the '764 patent.
REVERSED AND REMANDED

. The dissent asserts that the language discussing use of wavelengths greater than 650 nm is a remnant of an earlier parent patent and was retained in order to support additional claims (claims 77-80), which did not recite "photoseleetive vaporization” and were abandoned after being rejected as anticipated by prior art. The references to longer wavelengths all appeared in the initial application for the '764 patent, however, while claims 77-80 were not added until a later amendment. That sequence of events suggests that the longer-wavelength references were included because the original "photoseleetive vaporization” claims were intended to encompass longer wavelengths.